**JEANESE, INC., a corporation, et al.,**
**Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 39236.**

United States District Court
N. D. California, S. D.

March 3, 1964.

W. A. Lahanier, San Francisco, Cal., for plaintiffs.

Cecil F. Poole, U. S. Atty., Richard L. Carico, Asst. U. S. Atty., San Francisco, Cal., for defendant.

OLIVER J. CARTER, District Judge.

This is an action for refund of an alleged overpayment of Federal income taxes, paid on behalf of the now dissolved taxpayer, Jeanese, Inc. ("Jeanese"), for the fiscal period commencing February 1, 1957, and ending January 16, 1958. The amount of overpayment is alleged to be the sum of $28,667.04.

The facts have been largely stipulated to between the parties.

In 1953, Frank Crist and three other individuals formed a partnership and acquired King Ranch, a parcel of land of approximately 90 acres near Los Altos, California. The partnership, later increased to thirteen individuals, intended to subdivide the entire parcel, to sell the resultant lots, and to acquire and subdivide additional land in the area. To permit gradual development of King Ranch, it was divided into four arbitrary units, known as Mentone 1, Mentone 2, Mentone 3, and Mentone 4. Mentone 1 and 2 were the first two units subdivided, and the partnership sold a total of 62 of the 108 lots in those units prior to incorporation of Jeanese.[1]

Early in 1955, the partnership filed a tentative subdivision map with the Santa Clara County Engineer, showing the development of Mentone 3 and 4 as a single unit. The plan was never submitted for approval to the County of Santa Clara or to the City of Los Altos and was abandoned prior to commencement of any work thereon.[2]

In October, 1954, Jeanese was incorporated for the purpose of land development.[3] In February, 1955, Jeanese took

---

1. Stipulation of Facts, number 2.

2. Id.

3. Exhibit B, Articles of Incorporation.

over the assets of the partnership and continued development of King Ranch. Jeanese sold the lots remaining in Mentone 1 and 2 prior to commencement of the fiscal period in question.[4]

In November, 1955, a final subdivision map for Mentone 3 was submitted to, and approved by, the City of Los Altos. No on-site improvements—streets, sewers, etc.—had been completed, and Jeanese was required to, and did, deposit funds in escrow to guarantee completion. The improvements were not completed until the summer of 1957 and were accepted by the City of Los Altos in October, 1957.[5]

Jeanese sold thirteen of the Mentone 3 lots prior to May 23, 1956. On that date a deposit receipt pertaining to 36 of the 50 lots then remaining in Mentone 3 was executed by and between Jeanese, Builders Associates, Inc. ("Builders"), and R. V. Jones and Co. ("Jones Co."), as real estate agent.[6] Between the time of execution of the deposit receipt and the time of commencement of the fiscal period in question, Jeanese conveyed nine Mentone 3 lots. During the fiscal period Jeanese conveyed the remaining twenty-seven lots. Each of the twenty-seven lots was sold for $4,600, the price called for in the deposit receipt, for a total price of $124,200.[7]

On January 19, 1957, Jeanese's board of directors passed a resolution to dissolve and to liquidate, which was consented to in writing by the stockholders holding a majority of the voting power. That same day, January 19, the board also accepted an offer for the purchase of all of Mentone 4 for $208,000 in cash. The offer was later accepted by a majority of the stockholders. Jeanese received the purchase price on February 5, 1957, and reported the amount received on the income tax return it filed for the fiscal period in question. Claiming the non-recognition of gain or loss provision of section 337 of the Internal Revenue Code of 1954, 26 U.S.C. § 337, infra, the gain of $96,010.05 was not included as part of Jeanese's taxable income.[8]

On January 13, 1958, the stockholders executed an agreement transferring all of Jeanese's remaining assets to Frank Crist and two other individuals as a liquidating dividend, in trust, for Jeanese's stockholders.[9] No question as to the propriety of the use of trustees has been raised by the government, thus no issue is presented as to whether Jeanese was liquidated within the 12-month statutory period.

The fiscal period in question began February 1, 1957, and ended with the liquidation of Jeanese on January 16, 1958. After audit, the Internal Revenue Service determined that the gain on the sale of Mentone 4 was not subject to the nonrecognition provision of section 337, infra, and assessed a deficiency in Jeanese's federal income taxes in the amount of $38,667.04, based in part upon the inclusion of the gain from the sale of Mentone 4. Plaintiffs paid the assessed deficiency and interest and filed a claim for refund, which was denied by the Commissioner. The instant action for refund of taxes was then commenced.

The relevant portions of section 337 of the Internal Revenue Code of 1954 are subsections (a) and (b):

> *"Gain or loss on sales or exchanges in connection with certain liquidations*
>
> "(a) *General rule.*—If—
>
> > "(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
> >
> > "(2) within the 12-month period beginning on the date of the adop-

---

4. Stipulation of Facts, number 3.

5. Id., number 4.

6. Id.

7. The $124,200 is included in the "Sales of Lots" figure of $148,008.81, reflected on Jeanese's income tax return, the difference resulting from adjustments on repossessions and resales and on various deed of trust notes accepted in prior years.

8. Stipulation of Facts, number 5.

9. Id., number 5 and Exhibit H.

tion of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

"(b) *Property defined.*—

"(1) *In general.*—For purposes of subsection (a), the term 'property' does not include—

"(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business,

\* \* \* \* \*

"(2) *Nonrecognition with respect to inventory in certain cases.*—Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is attributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term 'property' includes—

"(A) such property so sold or exchanged, and

"(B) installment obligations acquired in respect of such sale or exchange."

In order for Jeanese to prevail, it must show that Mentone 4 was not a section 337(b) (1) (A) asset, or if it was, that the bulk sale exception of section 337(b) (2) applies.

## A.

▮ *Was Mentone 4 a Section 337 (b) (1) Asset?*

Not all assets of a liquidating corporation come within the nonrecognition of gain or loss provision of section 337(a). To reap the benefits of nonrecognition of gain, a corporate asset must be "property" as defined by section 337(b). Subsection (b) excludes from the definition of "property", with respect to which no gain or loss on a sale or exchange is to be recognized to the selling corporation, assets which are defined in its paragraph (1), subparagraph (A). Since The Congress clearly meant to exclude from nonrecognition of gain or loss upon any (1) sale of an inventory-type asset, or (2) sale of property held primarily for sale in the ordinary course of business, it is incumbent upon the Court to determine the proper construction to be placed upon the definition found in subparagraph (A).

Neither section 337 nor the Treasury Regulations promulgated thereunder define stock in trade or inventory, or property held by the corporation primarily for sale to customers in the ordinary course of its trade or business, and no case has been found by the Court defining such property as applied to real estate sold by a liquidating corporation.

In H.Rep. No. 1337, 83d Cong., 2d Sess., 1954 U.S.C.Cong. and Adm.News, pp. 4017–4619, the House Ways and Means Committee placed the tax consequences of a corporate liquidation in sections 331–336. With regard to those sections, the Committee reported that:

" \* \* \* In order to eliminate questions resulting only from formalities, your committee has provided that if a corporation in process of liquidation sells assets there will be no tax at the corporate level, but any gain realized will be taxed to the distributee-shareholder, as ordinary income or capital gain depending on the character of the asset sold." p. 4064

Proposed section 333 (which became section 337 of the Code), incorporated the rules relating to gain from the sale of property in a corporate liquidation, and made clear that the purpose of characterizing a particular asset in liquidation as either a "capital" asset or an

"ordinary" or "inventory" asset was to maintain the tax on doing business as ordinary income at the two traditional levels—first to the corporation and then to the shareholder. In its discussion of the section, the Committee said that, "Subsection (a) does not apply to any sale which is (1) a sale in the ordinary course of business or (2) a sale of an inventory asset (as defined in sec. 336 (d)) where the amount received for such asset exceeds 120 percent of the adjusted basis of such asset." 1954 U.S.C. Cong. and Adm.News, at page 4244.

The Senate, in S.Rep. No. 1622, 83d Cong., 2d Sess., 1954 U.S.C.Cong. and Adm.News, pp. 4621–5279, renumbered proposed section 333 as section 337, and said:

"Your committee provides that if a corporation adopts a plan of liquidation and liquidates within 12 months thereafter, sales of assets during this 12-month period will not result in tax at the corporate level. The House bill provides an exception to this rule where sales were made of so-called appreciated inventory. Your committee allows the nonrecognition of gain at the corporate level even if inventory is sold but requires that the inventory must be sold in bulk. This more nearly corresponds to the results that would follow a sale of all the corporate assets (including the inventory) and the sale of all the stock." p. 4680

In its detailed discussion of the Bill, the Report pointed out that, "It is intended that, during the 12-month period, sales in the ordinary course of business shall result in ordinary gain to the corporation as if the corporation were not in the process of liquidating." p. 4897. The Senate, as did the House before it, thus made clear its intent to apply the distinction between capital assets and inventory assets as a basis for determining what property the gain from which is subject to nonrecognition.

■ The congressional intent may be further illustrated by the use of substantially the same words in section 337(b) (1) (A) as are used in sections 312, 341, 512, 751, 1221, 1231, 1237 and 1402, to describe property of a certain type. Judicial interpretation of similar language in some of these other sections is helpful in determining the congressional intent by the words used in subparagraph (A).

■ The Congress is presumed to be familiar with judicial construction of particular words used in a statute, and approval of such construction may be implied by a recodification using the same words. The implication may have more or less force, but is especially forceful with words such as are used in subparagraph (A) of section 337(b) (1) since similar words [10] are found in the often interpreted sections 1221 and 1231 and their antecedent statutes, and had been a part of the Internal Revenue Code

10. "§ 1221. *Capital asset defined*
"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;"
"§ 1231. * * *
"(b) *Definition of property used in the trade or business.*—For purposes of this section—

"(1) *General rule.*—The term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—
"(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,
"(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or * * *."

for more than a decade at the time of the 1954 recodification. Earlier use of words may be used to color a subsequent use of substantially the same words without redefinition. Kent Manufacturing Corp. v. Commissioner, Cir. 4, 1961, 288 F.2d 812.

The Court may look to judicial interpretation of sections 1221 and 1231 (relating to capital gains and losses) as an aid in its determination as to whether Jeanese held Mentone 4 primarily for sale to customers in the ordinary course of its trade or business.

Whether Mentone 4 was held primarily for sale to customers in the ordinary course of Jeanese's trade or business is a question of fact. United States v. Rosebrook, Cir. 9, 1963, 318 F.2d 316, 319; Bistline v. United States, Cir. 9, 1958, 260 F.2d 77. The cases have repeatedly pointed out that no exact formula or inflexible, dogmatic rule of thumb can be used because each case is factually different—the formula must vary as the facts in a particular case vary. General guidelines can be found, however, as pathways for a solution of the question. The Court of Appeals for the Third Circuit collected many cases and summarized several approaches. "Factors considered are: (1) the purpose for which the property was acquired; (2) the purpose for which it was held; (3) improvements, and their extent, made to the property by taxpayer; (4) frequency, number and continuity of sales; (5) the extent and substantiality of the transactions; (6) the nature and extent of taxpayer's business; (7) the extent of advertising to promote sales, or the lack of such advertising; and (8) listing of the property for sale directly or through brokers." Kaltreider v. Commissioner, 3 Cir., 1958, 255 F.2d 833, 838.

It is Jeanese's claim that Mentone 4 was not held by it primarily for sale to customers in the ordinary course of its trade or business because it was in the business of selling subdivided lots, not unimproved parcels of land.

The following uncontradicted facts are presented by Jeanese in its trial memorandum in support of its disclaimer:

"While at one time a map showing Mentone 3 and Mentone 4 as a single subdivision to be called Mentone 3 was filed in the County Engineer's office, this project was abandoned and Mentone 3 alone, was thereafter subdivided and a map recorded covering it alone. Mentone 4 was never subdivided, no map was ever recorded. It was farmed at all times. In 1956 during the latter stages of the stockholder disputes following the death of Jones, the corporation president, serious consideration was given to subdividing Mentone 4 and selling the lots resulting therefrom. This was abandoned. At no time did JEANESE have any lots in Mentone 4 legally available for sale as subdivision lots. * * *" p. 4

In support of its position, Jeanese has submitted three Tax Court Memorandum decisions and one Revenue Ruling for consideration by the Court. They are: Wilson and Fields, TC Memo 1962–200 [1962 P–H Memo TC, par. 62,200]; A. Weil, 3 TC Memo 528 [1944 P–H Memo TC, par. 44,193]; J. O. Chapman, 3 TC Memo 604 [1944 P–H Memo TC, par. 44,173]; and Rev.Rul. 57–565, 1957–2 C.B. 546. Each is distinguishable from the case at bar.

In the Revenue Ruling, supra, taxpayer purchased a tract of undeveloped land in 1945 with the specific purposes in mind to establish a nursery on a parcel, speculate on a parcel, subdivide a parcel, and hold a parcel as an investment. The Commissioner determined the taxpayer not to be in the real estate business as to the investment parcel when, eleven years later, there was a sale of the investment parcel. In Chapman, supra, the Tax Court found as fact that the taxpayer purchased land in 1929 for the purpose of acquiring a highway right of way between his ranch and town. Ten years later, he subdivided part of the land and sold both the subdivided and the unsubdivided portions. Held, tax-

payer was in the "business" of selling the subdivided portion but not the unsubdivided portion. In Weil, supra, the holding was identical to Chapman when taxpayers acquired real property in 1934 in mortgage foreclosure proceedings and five years later subdivided part of the land and made sales of both subdivided and unsubdivided land. In Wilson and Fields, supra, a corporation was engaged in both subdivision development and in the construction, holding and renting of residential property for investment. It purchased a tract of raw land adjacent to a mental hospital for investment purposes, to construct, hold and rent a low-rental housing complex. Unable to obtain the required loan, taxpayer abandoned its project and sold the land as a single unit. The Tax Court found as a fact that the taxpayer's investment purpose was frustrated and the property was not held for sale in the ordinary course of business.

The flaw in this contention by Jeanese is that the purpose of Jeanese in holding the property was to sell the property in the course of business and no portion of the property was held for investment purposes. The argument places an emphasis upon the mode of sale rather than upon the purpose for which the land was held. Each of the citations relied upon by Jeanese stress the fact that the unsubdivided property which was the subject of the tax litigation was held for investment purposes and not held for purposes of sale in the ordinary course of business.

The record shows that Mentone 4 was farmed on a share-crop basis while awaiting development as a subdivision. This fact is not inconsistent with the purpose for which it was held. "A corporation organized for the purpose, among others, of developing large tracts of land, has the right to use the land for other legitimate purposes, such as farming, pending the ripening of the market for which it was intended. Under California corporation law such acts would be considered incidental to the transaction of its business and the attainment of its corporate purposes. California Corporations Code, § 802; * * *." Stockton Harbor Industrial Co. v. Commissioner, Cir. 9, 1954, 216 F.2d 638, 655. The stipulation of facts and the tax returns admitted into evidence show that Jeanese treated Mentone 4 as inventory. Uncontradicted testimony was received to the effect that Mentone 3 was farmed pending subdivision, and that it was treated as inventory on the corporate tax returns.[11]

In summation, the record shows that: (1) Jeanese was engaged in no other business except that of selling real estate; (2) the only realty it had to sell was Mentone 1, 2, 3 and 4; (3) it intended to, and did, sell each portion in the most advantageous manner available to it under the circumstances; (4) Mentone 4 was an arbitrary unit of a larger parcel of land; (5) the land was purchased for the purpose of subdivision; (6) a tentative subdivision map was filed showing the development of Mentone 3 and Mentone 4 as a single subdivision; (7) this plan was abandoned due to lack of cash; (8) it was decided to develop Mentone 3 first, and then Mentone 4; (9) R. V. Jones, the guiding spirit of the corporation, died, and thereafter, due to disagreements among the shareholders and due to inability to raise money to continue subdividing, the board of directors resolved to dissolve and liquidate; (10) on the same day an offer to purchase all of Mentone 4 as a single parcel was accepted by the board. These facts disclose no investment motive or purpose in holding Mentone 4 other than for sale to customers. The facts demonstrate to the Court that Mentone 4 was the last of four parcels intended to be subdivided in an orderly fashion, and that the only reason it was not subdivided was due to the death of Jones and subsequent discordance in shareholder harmony to such an extent that Jeanese had to be liquidated. Thus, the Court finds as a matter of fact that Mentone 4 was

11. Transcript, p. 47.

property held primarily for sale to customers in the ordinary course of its trade or business. As such, it was a section 337(b) (1) (A) asset.

## B.

*Does the Bulk Sale Exception of Section 337(b) (2) Apply?*

Section 337(b) (2) creates a socalled bulk sale exception to subsection (b) (1) (A) in that it permits the corporation to claim nonrecognition of gain or loss from a sale of assets under subsection (a) (2) if substantially all of the property is sold to one person in one transaction, even though the property was held by the corporation primarily for sale to customers in the ordinary course of its trade or business. The question here is whether Jeanese sold substantially all of its property when it sold Mentone 4. The question arises because on May 23, 1956, Jeanese, Builders and Jones Co. executed a deposit receipt agreement which pertained to 36 of the 50 lots then unsold in Mentone 3. Pursuant to the deposit receipt, 9 of the 36 lots were conveyed prior to the sale of Mentone 4, leaving 27 undeeded lots at the time of the sale.

Jeanese argues that Mentone 4 was substantially all of the property it owned at the time of its sale because the deposit receipt agreement constituted a contract of sale of all of the lots then remaining in Mentone 3. The government's position is that the deposit receipt was at most an executory contract to sell, and that the sale of Mentone 4 did not constitute a sale of substantially all of Jeanese's section 337(b) (1) (A) property to one person in one transaction.

The Court finds as a matter of fact that the deposit receipt was not a contract of sale, and that judgment must be awarded to the government, for reasons hereinafter mentioned.

The deposit receipt [12] appears to be a standard printed form commonly in use by real estate agents in the State of California. Consideration for the instrument is recited to be in the amount of "TWO HUNDRED FIFTY AND NO (250.00) (check)—Dollars as a deposit on account of purchase price of the following described property."[13] It recites that the total purchase price is $4,600 per each lot, "Seller to convey each lot to buyer or its assignee upon payment of $1700. Buyer or assignee will secure a construction loan for the purpose of constructing thereon a single family dwelling and will then execute a Note for the balance of the purchase price which shall bear interest at 6% per annum and be payable 8 months from date of deed or whenever the house built thereon is sold or occupied whichever sooner occurs. Said Note shall be secured by a 2nd Deed of Trust. Buyer shall take 3 lots per month, if more are taken in any one month the excess are [sic] to be credited on succeeding months. Second deed of trust to be subordinated to construction loan." [14] Among the boilerplate provisions, it is provided that if the purchaser shall fail to pay the balance of the purchase price or fail to complete the purchase as provided, the seller may, at his option, retain any amount paid thereon as agreed liquidated damages; that the taxes, fire insurance and rents are to be pro-rated from the date of closing transaction; that the property is sold subject to the owner's approval. All of the print was unmodified by the parties. Two of the spaces filled out by the parties were, "That possession of the premises to be given within one days after recordation of the deed," and "That the Real Estate Agent is allowed one days to secure the acceptance of the seller." The instrument concludes: "I agree to purchase the above described property on the terms and conditions herein stated and authorize seller to make the conveyance to Builders Associates, Inc. [Signed by the President] Purchaser. I agree to sell the above described property on the terms and conditions herein stated ....."

12. Complaint, Exhibit number 1.

13. Id.

14. Id.

Jeanese Corp. [by Myrtle H. Jones, President] Seller."

The face of the instrument negatives a sale. It is apparent that there was to be no delivery of a deed and no transfer of the burdens incident to ownership, such as the duty to pay taxes, or the rights incident to ownership, such as the right to possession, until (1) payment of $1,700 to Jeanese, (2) the obtaining of a construction loan, and (3) receipt by Jeanese of a promissory note secured by a deed of trust for the balance. It is abundantly clear that Jeanese intended to, and did, retain both title and possession under the deposit receipt contract until such time as Builders or its assignee complied with the express conditions precedent to Jeanese's duty to convey.

Jeanese and others treated the deposit receipt as a contract to sell in the future and not as a contract of present sale.

Jeanese, except for its final fiscal period beginning February 1, 1957, maintained its books and reported its income by use of the accrual method of accounting. The deposit receipt covering 36 lots was dated May 23, 1956, yet on its Federal income tax return for the fiscal period beginning February 1, 1957, Jeanese listed the remaining 27 of the 36 Mentone 3 lots (and all of Mentone 4) as property owned by Jeanese as of February 1, 1957. It also reported the gain from sale and the developmental costs of the remaining 27 Mentone 3 lots in the fiscal period beginning February 1, 1957, not the fiscal period in which the lots were sold if the sale occurred on May 23, 1956, the date of the execution of the receipt.[15]

"The essence of the accrual method of keeping accounts and making returns is that the right to receive and not the actual receipt determines whether an amount should be included in gross income. The right accrues when the right to receive the amount becomes fixed. Spring City Foundry Co. v. Commissioner of Internal Revenue, 292 U.S. 182, 184, 54 S.Ct. 644, 78 L.Ed. 1200. Correspondingly, the right to deduct an expense item accrues when the fixed obligation is incurred, even though the amount may be diminished by subsequent events. Both sides of the ledger must be treated alike. * * *" Ohmer Register Co. v. Commissioner, Cir. 6, 1942, 131 F.2d 682, 686, 143 A.L.R. 1164.

Prior to the dispute in issue, it is apparent that Jeanese did not consider the deposit receipt to be a present sale of the remaining 27 Mentone 3 lots for under the accrual method of accounting it would have been incumbent upon Jeanese to report the income from the sale in the fiscal year February 1, 1956, to January 31, 1957, the fiscal year prior to the fiscal period in issue.

Frank Crist, Jeanese's attorney, and a shareholder, referred to the deposit receipt as "an agreement to sell the remaining lots in Mentone III to Builders Associates," [16] and testified that the real estate agent (Jones Co.) handling the sale received its commission as each lot was taken.[17]

On August 23, 1956, Builders entered into an agreement with W. C. Garcia and Associates. The agreement said that "First Party [Builders] does hereby assign unto Second Party its *right to purchase* said lots in accordance with the terms of the said [deposit receipt] agreement." [18] Another assignment reads in substance the same. Most significant is a letter admitted into evidence in which Builders wrote Jeanese on June 12, 1957, saying, "Please refer to the deposit receipt dated May 23, 1956 between Builders Associates and Jeanese, Inc. made by your agent R. V. Jones Co. This receipt covers the *right of this corporation to purchase certain lots owned by you* * * Under said deposit receipt this corporation *agreed to purchase* and you *agreed*

---

15. Stipulation of Facts, stipulation nos. 4, 5, 6.

16. Transcript, p. 6.

17. Transcript, p. 33.

18. Exhibit 1.

*to sell* all of the lots specified \* \* \* [T]his corporation assigned to W. C. Garcia & Associates, a partnership, *its rights to purchase* under the terms of said deposit receipt."[19] A letter from W. C. Garcia and Associates to Jeanese said, "We now *desire to purchase* from you lots [specifying certain lots]."[20] Garcia wrote one Van Ness a letter beginning, "This will confirm in writing our understanding of how we will handle and deal with the property which I have *optioned* in Mentone Unit 3."[21] Builders in a board of directors resolution referred to the transaction as an *option*.[22] [All emphasis added].

This documentary evidence demonstrates that the original parties and the parties subsequently dealing with the deposit receipt did not interpret it as a sale.

Judicial construction of deposit receipts in California is in accord with this view. The California cases which consider deposit receipts similar to the one in this case construe the deposit receipt to be an executory contract to sell, if sufficiently certain as to terms, or merely a step in contract negotiations if the terms are not sufficiently certain, but never as a contract of sale. See: Coughlin v. Blair, 1953, 41 Cal.2d 587, 599, 262 P.2d 305; Freedman v. The Rector, 1951, 37 Cal.2d 16, 23, 230 P.2d 629, 31 A.L.R.2d 1; Smissaert v. Chiodo, 1958, 163 Cal. App.2d 827, 830–831, 330 P.2d 98; Cain v. Hunter, 1958, 161 Cal.App.2d 808, 811, 327 P.2d 583; Beason v. Griff, 1954, 127 Cal.App.2d 382, 274 P.2d 47.

This view is also consistent with the Treasury Regulations promulgated by the Commissioner under Section 337. Treasury Regulation Section 1.337–2(a), 26 C.F.R. § 1.337–2, provides in part:

"\* \* \* an executory contract to sell is to be distinguished from a contract of sale. Ordinarily, a sale has not occurred when a contract to sell has been entered into but title

and possession of the property have not been transferred and the obligation of the seller to sell or the buyer to buy is conditional."

The words quoted fit this case like a glove. There was a contract to sell the remaining lots of Mentone 3, but the seller retained both title and possession of the property, and conditions were inserted in the contract which would operate to prevent either party from specifically enforcing the other's entire performance. The contract as of the date of sale of Mentone 4 was both executory and conditional.

Jeanese strenuously urges that the deposit receipt is a "conditional sales contract." Jeanese does not define the term, but what is apparently meant is a security transaction whereby the seller retains legal title to the real property to secure the buyer's obligation to pay the price agreed upon in installments. Jeanese does not point out what language in the deposit receipt supports its conclusion, nor has it cited the Court to a case holding a deposit receipt to be such a sale. Sherman v. Quinn, 1948, 31 Cal.2d 661, 663, 192 P.2d 17, 19, summarized the California law when it said:

"The vendee in possession under a conditional sale contract, or one who holds the land subject to a deed of trust, is as much entitled to the exemption as a veteran who has title in fee simple. 'In a conditional sale, the title in the seller is for security only, to assure the payment of the purchase price. It carries with it none of the ordinary incidents of ownership. The buyer has the possession and use of the property to the complete exclusion of the seller, subject only to the seller's remedies in case of default. \* \*'"

Jeanese not only retained title to Mentone 3 after executing the deposit receipt, but Jeanese also held all the normal and ordinary incidents of ownership, in-

---

19. Exhibit 5.
20. Exhibit L.
21. Exhibit K.
22. Exhibit G.

cluding possession. Under these circumstances the deposit receipt is not a "conditional sales contract."

 Jeanese also alludes to the doctrine of equitable conversion in an effort to place the "ownership" in Builders hands. The case of Parr-Richmond Industrial Corp. v. Boyd, 1954, 43 Cal.2d 157, 165–166, 272 P.2d 16, 22, defines equitable conversion as follows:

"The doctrine of equitable conversion 'is a mere fiction resting upon the principle that equity regards things which are directed to be done as having actually been performed where nothing has intervened which ought to prevent such a performance.' [citation] An unconditional contract for the sale of land, of which specific performance would be decreed, grants the purchaser equitable title, and equity considers him the owner. [Citations] But there is no equitable conversion where the contracting parties demonstrate an intention to the contrary. [Citations]"

Applying these standards to the case at bar it is obvious that specific performance of the deposit receipt could not be decreed as to the 27 lots in Mentone 3 because of the conditions in the instrument, namely, Builders had not performed the condition of paying $1,700 cash per lot, obtained a construction loan, delivered a note secured by a deed of trust for the unpaid balance of the purchase price, and Jeanese could not tender title to more than three lots at a time.

 Jeanese says to the Court that section 337 was intended to eliminate the "double" taxation incident to the income taxation of most corporations, when a corporation is in the process of complete liquidation. The statement is correct, at least in part. The Congressional intent was to eliminate the problem of "who" made the sale—the corporation or the shareholders, Senate Finance Committee Report, No. 1622, 83d Cong., 2d Sess., 1954 U.S.C.Cong. and Adm.News,

pp. 4679–4680, for if the corporation made the sale of appreciated property, and then distributed the proceeds, both it and the shareholder paid taxes on the same gain, even though the corporation would have recognized no gain by distributing the same unrealized appreciated property directly to its shareholders in liquidation. It does not follow that "double" taxation was to be avoided entirely, for the statute expressly excludes nonrecognition of gain or loss from the sale of inventory-type property and of property held primarily for sale to customers in the ordinary course of business, unless a bulk sale of such assets took place. Nonrecognition was not intended by The Congress to apply to "ordinary" income of a corporation transacting business during its final winding up period.

 There is appeal to the thought that so long as Jeanese contracted to sell part of its property prior to liquidation and perhaps without thought of section 337 in mind, that the property covered by the contract should be treated by the Court as, in effect, sold. The plain language of section 337 makes it impossible to say a contract to sell is a contract of sale. The language "sale or exchange" has a fixed meaning in revenue laws, and no case has been found which would permit such words to be read broadly enough to permit a contract to sell or exchange to be treated in the same manner as a contract of sale or exchange.

 The Court, therefore, finds that the sale of Mentone 4 was not a sale of substantially all of the property of Jeanese since, at that time, Jeanese owned 27 lots in Mentone 3 which were the subject of an executory contract to sell.

Judgment, therefore, is awarded to the defendant with its costs of suit, and the opinion herein shall constitute the findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and counsel for defendant is directed to prepare and present a judgment in accordance herewith.