HOLLYWOOD BASEBALL ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93647.   Filed January 15, 1968.

*Arthur E. Gore*, for the petitioner.
*Melvin L. Sears* and *Roger Rhodes*, for the respondent.

OPINION

The issue for consideration is whether petitioner's sales of certain player contracts produced income which is not to be recognized by it under section 337 of the Code.[2]

---

[2] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

   (a) GENERAL RULE.—If—

   (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

   (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

   (b) PROPERTY DEFINED.—

   (1) IN GENERAL.—For purposes of subsection (a), the term "property" does not include—

      (A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business,

Respondent contends that the profits from the sales of the players' contracts are excluded from nonrecognition under section 337(b)(1)(A), and that two of the contracts were in fact sold prior to the adoption of the plan of liquidation. As in our previous opinion in this case, we again find it unnecessary to pass upon respondent's later contention, because we find and hold that such contracts did fall within the exclusion of 337(b)(1)(A).

Petitioner's contention is that its primary (principal) purpose (as defined by *Malat* v. *Riddell, supra*) for holding player contracts was to further its activity of playing baseball games, winning championships, and thereby drawing customers into the ball parks as paid admissions. It argues that such a purpose is not within the literal language of section 337(b)(1)(A), and contends that therefore those provisions do not apply to exclude its sales of player contracts from nonrecognition.

Under the remand to us we are to consider the facts of this case under section 337 as it has now been construed by the Supreme Court in *Malat* v. *Riddell, supra*. At the threshold we note that *Malat* v. *Riddell* was dealing with claimed capital gains treatment under the section 1221(1) definition of capital assets, while the instant case involves claimed nonrecognition-of-gain treatment by a corporation under the section 337(b)(1)(A) definition of property. Both sections are relief provisions, their language is substantially identical, and the circumstances of our mandate make it abundantly clear that the two sections are to be construed in an identical manner. Also, cf. *Jeanese, Inc.* v. *United States*, 227 F. Supp. 304 (N.D. Cal.)

The Supreme Court in *Malat* v. *Riddell, supra*, construed section 1221(1) (and therefore section 337(b)(1)(A)) in the following language:

The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand (*Corn Products Refining Co.* v. *Commissioner of Internal Revenue*, 350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial period of time" on the other. (*Commissioner of Internal Revenue* v. *Gillette Motor Transport, Inc.*, 364 U.S. 130, 134.) A literal reading of the statute is consistent with this legislative purpose. We hold that as used in § 1221(1), "primarily" means "of first importance" or "principally."

Thus the language of the Supreme Court expressly excludes the profits and losses realized from the normal everyday operation of a business from the beneficial treatment allowed by the statute.

Section 337 is a relief provision, designed to eliminate the difference in corporate tax consequences which formerly depended upon whether a corporation or its shareholders sold a liquidating corporation's assets. S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 258–260 (1954); H.

Rept. No. 1337, 83d Cong., 2d Sess., pp. A106–A109 (1954). Cf. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331; *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451. Therefore, compliance with section 337 prevents gain from being recognized at the corporate level. It is clear that the statutory purpose of providing parity of treatment for unusual sales in liquidations would not be served by granting nonrecognition for gain derived from ordinary sales in the ordinary course of a corporation's business.

Petitioner was regularly engaged in various activities, all of which combined and interacted with each other to make up one closely integrated business—the business of operating a minor league baseball club. Petitioner would have us fractionalize this business into classes of those various activities that went to make up its usual, everyday operation of that business and, for the purposes of this case, to ignore or to relegate to a position of minor importance an activity that was a prerequisite to its being in the baseball business at all. This is so because, as petitioner insists and as we have found, petitioner could not have initially obtained or continued to acquire any player contracts suitable for its business without having entered into the league agreement and the working agreements which required that petitioner sell such contracts on demand.

In *Malat* v. *Riddell*, *supra*, the Supreme Court approved the rationale of *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46, in its construction of the statutory provision with which we now deal. The question in *Corn Products* (as in *Malat*) was whether futures trading of the taxpayer came within the exclusions from the definition of the term "capital assets." [3]

The taxpayer in that case had bought corn futures to protect itself against an increase in the price of its principal raw material needed in its manufacturing operations. The Supreme Court held that the transactions were an integral part of the operation of the taxpayer's business, for without them it was faced with the possibility that it would not be able to obtain a ready supply of its necessary raw material, and at a price to permit of profitable operation.

In attempting to show that profits derived from the futures transactions were to be given capital gains treatment, the taxpayer pointed out that such transactions did not come within any of the exclusions from the term "capital asset" as enumerated in section 1221(1).

---

[3] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business ;

The Supreme Court held that such transactions were in fact excluded from the definition of capital assets and that their gains were to be taxed as ordinary income, stating:

> Nor can we find support for petitioner's contention that hedging is not within the exclusions of § 117(a). Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provisions of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. *Burnet* v. *Harmel*, 287 U.S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by §117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." *Burnet* v. *Harmel*, 287 U.S., at 106. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in § 117. See *Hort* v. *Commissioner*, 313 U.S. 28, 31; *Kieselbach* v. *Commissioner*, 317 U.S. 399, 403.

Petitioner's obligations under the league agreement and the working agreements were quite similar to the futures contracts in *Corn Products* in that they enabled petitioner to obtain ballplayers and guaranteed that the cost of ballplayers to petitioner would not become so high as to make it impossible for it to remain in the baseball business.

In *Corn Products*, entering into the futures contracts was a hedge against a high cost of essential materials to be used in manufacturing. In the instant case, entering into the league agreement and the working agreements was a similar hedge, and even more, for it was the only way for it to obtain the contracts of suitable players in the first instance.

There are other respects in which the integral tie-in to petitioner's business activities is greater than that in *Corn Products*. While the taxpayer in *Corn Products* purchased corn futures for a business purpose, it could exercise the futures contracts or sell them as it saw fit for whatever ends it desired. In the present case, petitioner was required to sell a player's contract when called upon by the P.C.L. or the Pittsburgh club. Thus, there was less opportunity for it to hold player contracts as an investment to be sold when market conditions looked favorable. In order to enter, and to stay in business, petitioner had to agree to sell player contracts even though such sales were not in its best economic interest. The taxpayer in *Corn Products* at least exercised its futures contracts only when it was to its advantage to do so.

The sale of 224 player contracts from 1948 through 1957 shows that petitioner's obligation to sell had substance and was a vital, integral

part of the day-to-day operation of its business. As in *Corn Products*, we can see no way to exclude this type of transaction from the mainstream of the taxpayer's business.

Petitioner cites a number of cases where assets used in a business were allowed capital gains treatment upon disposition, even though the sales took place on a regular basis. These include *Massey Motors v. United States*, 364 U.S. 92 (1960); *Hertz Corp. v. United States*, 364 U.S. 122 (1960); *Grant Oil Tool Co. v. United States*, 381 F. 2d 389 (Ct. Cl. 1967); *Hillard v. Commissioner*, 281 F. 2d 279 (C.A. 5, 1960), reversing 31 T.C. 961; *Albright v. United States*, 173 F. 2d 339 (C.A. 8, 1949); *McKinley Kirk*, 47 T.C. 177 (1966); *Philber Equipment Corp. v. Commissioner*, 237 F. 2d 129 (C.A. 3, 1956), reversing 25 T.C. 88; *E. I. Du Pont De Nemours and Co. v. United States*, 288 F. 2d 904 (Ct. Cl. 1961); *Philadelphia Quartz Co. v. United States*, 374 F. 2d 512 (Ct. Cl. 1967); *D. L. Phillips*, 24 T.C. 435 (1955). In our view these cases are distinguishable, since, in none of them were both the purchase and the sale entered into in order that the taxpayer could carry on business in the first instance. In each, the sales were merely incidental to the operation of the business. There was no necessity that any sales eventually be made in order for the business to commence or continue, though it was likely in many of the cases that the sale of assets would take place on a regular basis.

In the instant case, petitioner had to agree to sell player contracts at a fixed price before it could obtain them. Without entering into the working agreements and the league agreement, it could not have engaged in the professional baseball business at all. The agreements and the sales thereunder were at the heart and core of its business, essential for its existence, let alone the efficient operation of same.

The situation here is more nearly similar to those found in *McMillan Mortgage Co.*, 36 T.C. 924 (1961); *Hagan v. United States*, 221 F. Supp. 248 (1963); *Booth Newspaper, Inc. v. United States*, 303 F. 2d 284 (C.A. 6, 1960), affirming 31 T.C. 902; *Bagley & Sewall Co.*, 20 T.C. 983 (1953); and *America-Southeast Asia Co.*, 26 T.C. 198 (1956), where the Court's decision was based on rationale similar to that used in *Corn Products, supra*. In each of these cases the taxpayer entered into a transaction where both the acquisition and disposition of assets constituted an integral part of carrying on the business in the first instance, and in each case it was held that the transaction resulted in ordinary income or loss to the taxpayer.

Consideration of the entire record in the instant case, and giving due weight to all of the circumstances surrounding the player contracts, requires us to find and hold that they were an integral part of, and at the heart and core of petitioner's business. They were its stock in trade and were being held by petitioner principally for sale to customers in

the ordinary course of its trade or business within the meaning of section 337 as the similar section 1221(1) was construed by the Supreme Court in *Malat* v. *Riddell, supra.* Petitioner argues that its principal purpose in holding the contracts was to play baseball, but before the game could start petitioner had to agree to sell the contracts on demand. Therefore, in our view, its motive of first importance was to hold the contracts for sale.

*Decision will be entered for the respondent.*