**HOLLYWOOD BASEBALL ASSOCIA-TION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

**No. 23056.**

United States Court of Appeals, Ninth Circuit.

Feb. 16, 1970.

Arthur E. Gore (argued), Oceanside, Cal., for petitioner.

Michael B. Arkin (argued), Harry Baum, Attys., Dept. of Justice, Johnnie M. Walters, Asst. Atty. Gen., Dept. of Justice, K. Martin Worthy, Chief Coun-

sel, IRS, Washington, D. C., for respondent.

Before BARNES, BROWNING and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Hollywood Baseball Association seeks review of a decision of the Tax Court. This is the second time that the case has been before us. The first decision of the Tax Court is reported at 42 T.C. 234 (1964). We affirmed, 1965, 352 F.2d 350. On certiorari, the Supreme Court reversed and remanded for reconsideration in the light of Malat v. Riddell, 1966, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102. Hollywood Baseball Ass'n v. Commissioner, 1966, 383 U.S. 824, 86 S.Ct. 1221, 16 L.Ed.2d 291. We remanded to the Tax Court for new findings. The Tax Court again decided for the Commissioner, 1968, 49 T.C. 338. We affirm.

The facts are stated in detail in the first decision of the Tax Court. In the decision now under review, the Tax Court did not receive additional evidence. It found that Hollywood's "player contracts were petitioner's stock in trade, held principally for sale to customers in the ordinary course of its trade or business within the intendment of section 337 [I.R.C. § 337(b) (1) (A)] as construed by the Supreme Court in *Malat*. * * *" The opinion, however, makes it clear that this "finding" is a legal conclusion that the player contracts "were an integral part of, and at the heart and core of petitioner's business. * * * Petitioner argues that its principal purpose in holding the contracts was to play baseball, but before the game could start petitioner had to agree to sell the contracts on demand. Therefore, in our view, its motive of first importance was to hold the contracts for sale."

The record also makes it clear that this holding is not really based upon *Malat*, *supra*, but on the decision in Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46. 76 S.Ct. 20, 100 L.Ed. 29. As the Tax Court put it, "In *Malat*

* * * the Supreme Court approved the rationale of *Corn Products* * * * in its construction of the statutory provision with which we now deal."

Were it not for *Corn Products*, we would have great difficulty with this decision. It is uncontradicted that Hollywood was organized and operated as a minor league baseball club. The primary reason for its existence was to make money by playing professional baseball and selling tickets to the games. To do this, it had to have players, just as a factory has to have a building, machinery and employees. The peculiar rules of baseball required that it make its player contracts available for sale. But nothing in the record would support a finding that it made the contracts available because it wanted to—that this was the reason why it made the contracts, or that it wanted to sell its best players, either under the player draft or under its working agreement with Pittsburgh. We think that the contrary is obviously true—it sold its players because it had to agree to do so in order to be in business. We have no doubt that it hoped that it could keep its players. In short, we think it quite unrealistic to say that *in fact*, to use the language of *Malat*, Hollywood's player contracts were held by it "principally" for sale to customers, or that sale to such customers was "of first importance" in its holding of the contracts.

Nevertheless, we conclude that the principle of *Corn Products* is applicable here, and that the Tax Court correctly applied it.

In *Corn Products, supra,* a manufacturer of products made from grain corn purchased corn futures in order to insure an adequate supply of raw materials. If no shortage of corn was imminent, the company would later sell the futures. This system protected it against price increases for corn. The Supreme Court held that the profits and losses from the transactions in corn futures were *not* entitled to capital assets treatment, because the transactions were an "integral part" of its business. (350

U.S. at 51, 76 S.Ct. at 24.) The Court's reasoning is:

"Nor can we find support for petitioner's contention that hedging is not within the exclusions of § 117(a). Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. Burnet v. Harmel, 287 U.S. 103, 108, 53 S.Ct. 74, 76 L.Ed. 199. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S., at 106, 53 S.Ct. at 75. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term 'capital assets' in § 117. See Hort v. Commissioner, 313 U.S. 28, 31, 61 S.Ct. 757, 758, 85 L.Ed. 1168; Kieselbach v. Commissioner, 317 U.S. 399, 403, 63 S.Ct. 303, 305, 87 L.Ed. 358."

Section 117(a) of the 1939 Code is now § 1221 of the 1954 Code.

In *Malat, supra*, petitioner was part of a joint venture which bought a 45 acre tract of land. He claimed that the intended use was for an apartment project; the government claimed that the intended use was dual: either developing for rental purposes, or selling, whichever proved to be the more profitable. The District Court found the dual purpose, and that the property was therefore held "primarily" for sale to customers in the ordinary course of business, with "primarily" meaning "substantially." The Supreme Court held that "primarily" meant just what it said —"of first importance" or "principally," and remanded for further findings. The Court's entire discussion of its reasons is as follows:

"The purpose of the statutory provision with which we deal is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand [citing *Corn Products*] and 'the realization of appreciation in value accrued over a substantial period of time' on the other (Commissioner v. Gillette Motor Co., 364 U.S. 130, 134, 80 S.Ct. 1497, 4 L.Ed.2d 1617.) A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in § 1221(1), 'primarily' means 'of first importance' or 'principally.'" (383 U.S. at 572, 86 S.Ct. at 1032.)

A recent article (Bernstein, "Primarily for Sale": A Semantic Snare, 20 Stan. L.Rev. 1093 (1968)) argues persuasively that the Supreme Court erred in *Malat* because all the lower courts and the lawyers had framed the issues incorrectly. Everyone treated the case as a "dual purpose" one, whereas it should have been treated as an "undecided purpose" case, which is more analogous to a "change of purpose" case. Anyone who purchases property, even if solely for investment purposes, will sell it if offered a sufficiently attractive price.

However, the Supreme Court has spoken, and has spoken broadly, and we are bound by its decision. Moreover, it is clear that our case is not a dual purpose, change of purpose, or undecided purpose case. It is, rather, unique: contracts, the terms of which are a condition precedent to the carrying on of the main purposes of the business, playing

baseball and selling tickets, and which make the contracts saleable on the demand of a buyer.

A preliminary question is whether or not *Malat* is applicable to this case at all. First, *Malat* dealt with § 1221(1) assets. Is the same reasoning also applicable to § 1231 (depreciable) assets such as are involved here? The same phrase, "primarily for sale to customers in the ordinary course of his trade or business" is to be found in both sections, and the Court in *Malat* emphasized that "the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses." We see no reason why the word "primarily" should be viewed differently in § 1231 than in § 1221. Accordingly, *Malat* applies to § 1231 assets.

A second preliminary question is whether *Malat* applies to § 337. Again, the language used is similar. Furthermore, the Supreme Court's vacation and remand of the instant case "for further consideration in light of Malat v. Riddell" [383 U.S. 824, 86 S.Ct. 1221] would seem to indicate that the similar language of the two statutes is to be construed similarly. Accord, Pridemark, Inc. v. Commissioner, 4 Cir., 1965, 345 F.2d 35, 45. Apparently, the Supreme Court thinks that *Malat* is applicable.

Although, technically, the Supreme Court's language in *Malat* is dictum insofar as sections 1231 and 337 are concerned, it is certainly dictum which cannot lightly be disregarded. Yet, as we have seen, it is arguable that this is exactly what the Tax Court has done. The Tax Court has purported to merge the "primarily" test of *Malat* with the "integrally" test of *Corn Products,* and would deny capital asset treatment on the finding that the sales were *"an* integral part" of the business. Nevertheless, in *Malat* the Supreme Court cited *Corn Products* with approval, and relied upon its reasoning. We therefore think that it was proper for the Tax Court to do so in this case.

We think that the Tax Court properly held that Hollywood is not entitled to the benefits of § 337 under the *Corn Products* rationale, even though the player contracts were *not* primarily held for sale to customers in the ordinary course of business. This result depends on three steps: (1) that *Corn Products* is applicable to depreciable assets; the baseball player contracts are subject to depreciation; (2) that *Corn Products* is applicable to § 337; *Corn Products* itself was a § 1221 case; and (3) that the requirements of *Corn Products* are met, the integral "core" test. We discuss each of these steps in turn.

(1) Is *Corn Products* applicable to depreciable property?

Although the Commissioner has attempted to extend *Corn Products* to depreciable property, which we refer to as § 1231 assets, see Rev.Rul. 58–77, 1958–1 Cum.Bull. 118, the attempt has so far been unsuccessful. See Bernstein, *supra,* 20 Stan.L.Rev. at 1116. However, only the Court of Claims and a few district courts have been presented with this problem. Although the Court of Claims has noted that no case has applied *Corn Products* to § 1231 assets, and although it "questions" its applicability, in each case presenting the question the Court has reserved the question, instead of holding that the sales involved were not "integral." See E. I. Du Pont De Nemours & Co. v. United States, 1961, 288 F.2d 904, 153 Ct.Cl. 274; Philadelphia Quartz Co. v. United States, 1967, 374 F.2d 512, 179 Ct.Cl. 191; Grant Oil Tool Co. v. United States, 1967, 381 F.2d 389, 398, 180 Ct.Cl. 620. In Fishing Tools, Inc. v. Usry, E.D.La., 1964, 232 F.Supp. 400, the court rejected a contention that *Corn Products* applied evidently because there was no pattern of regularity as to the activities in question.

Deltide Fishing & Rental Tools, Inc. v. United States, E.D.La., 1968, 279 F. Supp. 661, is the only case to confront the problem squarely. As alternate holding, the Court said that *Corn Prod-*

*ucts* did *not* apply to depreciable assets. Its reasoning is as follows:

> "Section 1231 refers to the very class of property excluded from the definition of capital-asset by § 1221(2) [as depreciable] and, with certain qualifications, allows gains from sales or involuntary conversions of such property to be *treated,* or, to use the exact language of the statute, '*considered* as gains \* \* \* from sales or exchanges of capital assets. \* \* \*' § 1231(a) (emphasis added). \* \* \* 'Congress has said, in effect, that even though property used in the trade or business is not a capital asset, we are to treat it as a capital asset.'" [at p. 665.]

The court then distinguished broad language in Commissioner v. Gillette Motor Transp., Inc., 1960, 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617, that "'property used in the trade or business' (§ 1231) to be eligible for capital-gains treatment, must satisfy the same general criteria as govern the definition of capital assets." The court then continues:

> "Congress has thus said, in effect, that even though property used in the trade or business is not a capital asset, we are to treat it as a capital asset. In so doing, Congress may well have established a *fence of immunity* from the *Corn Products* doctrine around 'property used in the trade or business': the *Corn Products* doctrine permits the courts to carve out nonstatutory exceptions to the definition of capital asset; but Congress has said that where property used in the trade or business is concerned, it will be treated as a capital asset even though it is not a capital asset." [279 F.Supp. at p. 666.]

The court also "deemed it of some weight" that in the 1939 Code, all capital asset provisions were dealt with in § 117; but in the 1954 Code, Congress split that section into several headings, with § 1221 under the title *"General* Rules for Determining Capital Gains and Losses,"* and § 1231 under the heading *"Spe-* *cial* Rules for Determining Capital Gains and Losses."

We find this argument unconvincing. Whether property comes under § 1221 (and is therefore *defined* as a capital asset) or whether it comes under § 1231 (and is therefore *treated* as a capital asset even though it is excluded from the § 1221 definition) should make no difference, because the policy is the same—not to give preferential treatment to profits and losses arising from the everyday operation of the business. Where the transactions are "everyday," there would be no "excessive tax burden" in taxing them as ordinary income. We do not see why the fact that the property is subject to depreciation should make any difference. Finally, the fact that in enacting the 1954 Code Congress split former § 117 into two or more different sections proves nothing. The legislative history shows that no substantive changes were intended. See [1954] 3 U.S. Code, Cong. & Adm.News, pp. 4415, 4417, 5075, 5076.

*Deltide* is the only case to discuss the applicability of *Corn Products* to depreciable assets. A law review article (Bernstein, 20 Stan.L.Rev. at 1116 (*supra*)) argues:

> "*Corn Products* represents judicial indifference to statutory language. Courts therefore are apt to be reluctant to broaden its scope. It is not unlikely that they will continue to confine it to situations analogous to its own facts: namely, transactions outside the ordinary course of the business that serve a special function of protecting or preserving some asset (usually inventory) used in the normal course of the business. Despite efforts by the Government, the *Corn Products* doctrine has not been extended to sales of depreciable property."

But as noted above, all of the cases cited (*Deltide* came later) reserved the question of the applicability of *Corn Products* to § 1231 assets. And even assuming that *Corn Products* is and should be limited, as Bernstein says, there is nothing in

such a limitation that would necessarily exclude depreciable property. If the transactions serve the function of preserving depreciable property, why should *Corn Products* not apply? We hold that *Corn Products* can be applied to depreciable assets.

(2) Is *Corn Products* applicable to § 337?

The Tax Court applied *Corn Products* to § 337 by equating its "integral" test with the "primarily" of "property held primarily for sale." As noted above, we doubt that this can be done. In *Malat*, the Supreme Court held that "primarily" means "of *first* importance." Hence, the fact that an activity is *an* integral part of a business is not enough. Also, *Corn Products* has nothing to do with "primarily for sale." It is a separate, nonstatutory exception to the definition of capital assets. As such, can it be extended to § 337?

It readily appears that § 337 does not necessarily make distinctions based on whether or not property is a capital asset. Under §§ 1221 and 1231, all property is either defined as a capital asset or treated as one, *except*:

a. copyrights, etc.

b. depreciable property or realty used in trade or business and held *less* than 6 months

c. depreciable property or realty used in trade or business, held *more* than 6 months, and which is

   (1) inventory

   (2) stock in trade, or

   (3) held primarily for sale to customers in the ordinary course of business

By contrast, § 337 applies to all property except

a. stock in trade

b. inventory

c. property held primarily for sale to customers in the ordinary course of business

d. certain installment obligations

In other words, the fact that property is not defined as or treated as a capital asset under §§ 1221 and 1231 does not necessarily mean that it is not entitled to nonrecognition under § 337. Contra, Pridemark, Inc. v. Commissioner, 4 Cir., 1965, 345 F.2d 35, 45. Consequently, the *Corn Products* nonstatutory exception to the definition of capital assets is not necessarily applicable to § 337.

It has been held in numerous cases that court decisions and legislative history in connection with §§ 1221 and 1231 are relevant in construing § 337. See, e. g., Jeanese, Inc. v. United States, N.D. Cal., 1964, 227 F.Supp. 304, 308. However, these cases (except *Pridemark, supra*) were dealing with the phrase "primarily for sale, etc." which appears in both § 337 and in the capital asset sections. As noted above, the *Corn Products* doctrine, although in some way related to the concept behind "primarily for sale," is actually independent of it.

So the question remains, what is the purpose behind the various exclusions from § 337? The legislative history is notably unhelpful. A Senate report says, "It is intended that, during the 12-month period, sales in the ordinary course of business shall result in ordinary gain to the corporation as if the corporation were not in the process of liquidating." S.Rep. No. 1622, 83d Cong., 2d Sess., [1954] 3 U.S.Code Cong. & Adm.News, pp. 4621, 4897. However, this sentence, although relied on in *Pridemark, supra,* appears in a paragraph discussing the bulk sales exception, § 337(b) (2), relating to inventory.

According to the Commissioner's brief:

"The declared legislative purpose in limiting nonrecognition of gain or loss at the corporate level to properties qualifying as capital assets (or inventory assets sold in bulk sale to one buyer) was to prevent taxpayers from escaping tax on sales 'made *in the ordinary course of business* of the corporation' merely because the income was received during the 12 months liquidation period." (Emphasis sup-

plied.) H.Rep. No. 1337, 83d Cong., 2d Sess. p. A–107 ([1954] 3 U.S. Code Cong. & Adm.News, pp. 4017, 4245.)

Not quite. As already noted, § 337 does not speak in terms of capital assets, and the definitions of property under § 337 do not always jibe with the definitions under §§ 1221 and 1231. Furthermore, the Commissioner is quoting from the House Report, which said:

> "Paragraph (1) of subsection (a) makes this subsection specifically inapplicable to a sale made in the ordinary course of the business of the corporation although such sale occurs after adoption of the plan of partial or complete liquidation." ([1954] 3 U.S. Code, Cong. & Adm.News, p. 4245.)

However, the House bill said that subsection (a) did not apply to any "sale in the ordinary course of business." And this bill never passed. The Senate bill (which ultimately did pass) uses quite different language "stock in trade * * * inventory * * * property held by the corporation primarily for sale to customers in the ordinary course of business." The Senate Report does not say why the terminology was changed, except to say that:

> "While the purpose intended to be served by section 337 [Senate] is similar to that provided in section 333 of the House bill, the language and approach of section 337 differs from that of section 333." ([1954] 3 U.S. Code Cong. & Adm.News, at p. 4896.)

The Senate Report also says:

> "It is intended that, during the 12-month period, sales in the ordinary course of business shall result in ordinary gain to the corporation as if the corporation were not in the process of liquidating." (*Id.* at p. 4897.)

Again, this sentence appears in a section discussing the bulk sales exception relating to inventory. Perhaps the changes in terminology were made in order to make the language of § 337 more nearly approximate the language of §§ 1221 and

1231. If so, it would seem to follow that *Corn Products* is applicable to § 337.

This conclusion becomes more reasonable in view of the rule that § 337 should be strictly construed. See Whitson v. Rockwood, D.N.D., 1960, 190 F.Supp. 478, 481; *cf.* Factor v. Commissioner, 9 Cir., 1960, 281 F.2d 100, 119.

Finally, the Commissioner argues that the Supreme Court by remanding this case for further consideration in the light of *Malat*, "made it quite clear that the correlative provisions of § 337 and § 1221 are to be construed in an identical manner." Again, not quite. All the Supreme Court's action indicates is that the Court saw that the provisions are *arguably* similar, and left it to the lower courts to decide if in fact they are.

We conclude that *Corn Products* is applicable to § 337.

(3) Are the requirements of *Corn Products* met?

The cases are not always consistent. Thus, the Tax Court in the instant case emphasized the *involuntariness* of the baseball player contract sales as showing that they were "integral."

> "The agreements and the sales thereunder were at the heart and core of its business, essential for its existence let alone for the efficient operation of same."

But Hollywood argues that other cases have held that the *necessity* of an activity can show that capital asset treatment is appropriate. In Philber Equipment Corp. v. Commissioner, 3 Cir., 1956, 237 F.2d 129, a taxpayer in the business of renting trucks and the like also regularly sold them after they had been rented a while:

> "[S]uch sales were not part of a business of selling trucks, but rather the natural conclusion of a vehicle rental business cycle. Further, the rental period was not the result of a voluntary act on taxpayer's part, but rather an unavoidable consequence of conditions existing in the business. The acquisition and disposition of equipment was an essential aspect of the business of

renting equipment * * *. Standing alone, such disposition, even though a necessary and frequent element of taxpayer's business, cannot be considered inconsistent with the conduct of a rental business or make the sale factor a dominating business purpose of taxpayer."

Accord, Hillard v. Commissioner, 5 Cir., 1960, 281 F.2d 279.

However, these cases were dealing with the phrase "held primarily for sale, etc." They did not cite *Corn Products* at all—except that the dissent in *Hillard* said that the sales of rental cars:

"are not entitled to the preferential treatment provided in Section 117 for 'transactions in property which are not the normal source of business income.' *Corn Products* * * *.'"

Compare Massey Motors, Inc. v. United States, 1960, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592, and Hertz Corp. v. United States, 1960, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603, which simply assumed that rental businesses were entitled to capital asset treatment when the rental equipment was sold. See *Hillard, supra,* 281 F.2d at 283–284. Consequently, *Philber Equipment* and *Hillard* are not very strong authority against the result reached by the Tax Court in the instant case.

The Commissioner relies on a number of cases in support of the application of *Corn Products* to this case. We summarize them in the margin.[1] Appellant

1. (1) Mansfield Journal Co. v. Commissioner, 6 Cir., 1960, 274 F.2d 284. A publisher entered into a ten year contract for a supply of 1000 tons of newsprint, in order to assure itself a continuous supply. In some years, it sold its right to receive portions of the tonnage to other papers. Held, not entitled to capital gain treatment, as in the nature of a commodity future, relying on *Corn Products.* The contract was not an investment, but a means of protection, "unalterably tied in with and related to petitioner's publishing business." Petitioner was not acting as a capital investor, but as a "far-sighted manufacturer." The court construed the definition of capital asset narrowly, and its exceptions broadly.

(2) Commissioner v. Bagley & Sewall Co., 2 Cir., 1955, 221 F.2d 944. Taxpayer was required to deposit government bonds as security for performance of a contract with Finland. When the bonds were returned upon performance of the contract, taxpayer immediately sold them, at a loss. Held (affirming Tax Court): the loss was deductible as an ordinary and necessary business expense, since the bonds were assets held for sale in the ordinary course of business. The transaction was merely an incident to and necessitated by the performance of the contract in the ordinary course of business. (This case was decided a few months before *Corn Products.*)

(3) Booth Newspapers, Inc. v. United States, 1962, 303 F.2d 916, 157 Ct.Cl. 886. Two newspapers purchased all the stock of a paper mill in order to assure a supply of newsprint. Several years later, after having signed contracts which assured them of an adequate supply of newsprint, they sold the stock at a substantial loss. Held, the papers were entitled to ordinary loss treatment, since the losses were ordinary business expenses. *Corn Products* and other cases were discussed. "They [the cases cited] stand for the proposition that, if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business * * * any loss incurred * * * may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code." 303 F.2d at 921.

(4) John J. Grier Co. v. United States, 7 Cir., 1964, 328 F.2d 163. Plaintiff restauranteur wanted to purchase a supper club from its corporate owner. Since the lessor of the premises was unlikely to agree to any assignment of the lease to Grier, he bought all the stock of the corporation for the same price he would have paid for the supper club assets themselves. A few years later, he sold the stock to the lessor at a substantial loss. Held, he was entitled to an ordinary loss deduction. He bought the stock, which had value only to someone who wished to operate the Club, only to secure the assets as an incident to conduct of its restaurant business, and not as an investment. *Corn Products* was not cited.

seeks to distinguish these cases on the ground that in each there was a definite tie-in between the item in question and the taxpayer's inventory or property admittedly held primarily for sale, while in the case at bar the Tax Court could find no property initially held primarily for sale in the first place for a tie-in.

We disagree. In *Mansfield Journal* and *Booth Newspapers*, the contracts were entered into to assure a supply of raw materials. They had nothing to do with inventory or property held primarily for sale. The taxpayers were selling newspapers, not news print. *Bagley & Sewall* and *John J. Grier Co.* similarly had nothing to do with inventory or property held primarily for sale. Rather, the activities in all of these cases were conducted in order to allow the taxpayer to conduct his business at all. "The transaction was merely an incident to and necessitated by the performance of the contract in the ordinary course of business." [*Bagley & Sewall.*] Sometimes the contracts relate to inventory, etc., and sometimes not. What is important is that the activities were "integral"—carried on *to protect or to allow the function* of the taxpayer's true business. Similarly, taxpayer in the case at bar signed agreements requiring it to give up baseball players at the will of the major leagues, in order to be assured of a supply of capable ball players in the first place. The ball players are, in a sense, the "raw materials" of appellant's business. The product is baseball games.

The cases upon which Hollywood relies are distinguishable: Scheuber v. Commissioner, 7 Cir., 1967, 371 F.2d 996 involved real estate held for from 8 to 14 years and sold without advertising. Hillard v. Commissioner, 5 Cir., 1960, 281 F.2d 279 involved sales of used cars by a person in the car rental business. Philber Equip. Corp. v. Commissioner, 3 Cir., 1956, 237 F.2d 129 also involved sales of used equipment of a leasing business. E. I. DuPont De Nemours & Co. v. United States, 1961, 288 F.2d 904, 909, 153 Ct.Cl. 274, involved forfeited deposits on unreturned pressurized gas cylinders. Philadelphia Quartz Co. v. United States, 1967, 374 F.2d 512, 515, 179 Ct.Cl. 191; Grant Oil Tool Co. v. United States, 1967, 381 F.2d 389, 180 Ct.Cl. 620, and Deltide Fishing & Rental Tools, Inc. v. United States, E.D.La., 1968, 279 F.Supp. 661 are similar. Albright v. United States, 8 Cir., 1949, 173 F.2d 339, and Kirk v. Commissioner, 1966, 47 T.C. 177, involved sales of culls from a herd or stable of breeding animals.

In the case at bar, Hollywood had to agree to sell the player contracts on de-

(5) F. W. Drybrough, 45 T.C. 424, 437–448 (1966), aff'd per curiam, 6 Cir., 1967, 384 F.2d 715. The owner of a collection agency had bought some accounts from his clients, and later sold them, along with the rest of the business. Held, the accounts were not capital assets under the teaching of *Corn Products*; they were the "normal source of business income," and were involved in the everyday operation of the business. "When viewed in this light, the accounts were, in fact, 'stock in trade,' properly includible in inventory although the actual sales of these accounts were few, the collections upon them were, in a sense, tantamount to sales." The sixth circuit affirmed per curiam, "on the authority of" *Corn Products* and *Mansfield Journal.*

(6) Hallcraft Homes, Inc. v. Commissioner, 9 Cir., 1964, 336 F.2d 701, 705. A land developer was required to advance, or loan, thousands of dollars to local water companies to pay for the installation of water lines, etc. The sums were to be repaid over a period of years as a percentage of the receipts which the water companies would get from the new users. Later, the City of Phoenix purchased the water companies and their liabilities, and plaintiff agreed to accept a lump sum in exchange for the future repayment rights. Held taxable as ordinary income on non-*Corn Products* grounds. But the court said: "It is true that the taxpayer in the case at bar entered into water refund agreements as an integral part of its business. * * * Since the sale was made in good faith in the furtherance of the business, and since the agreements were entered into as an integral part of the business of the taxpayer, the 'integral part of the business' theory of *Corn Products* might very well be compelling and controlling here. Yet we need not so decide, and do not * * *.'"

mand, in order to be in the baseball business. In the cases discussed above, on the other hand, the sales activities were merely part of the last phase of a cycle in the use of capital goods, the replacement or sale of equipment no longer usable in the business itself. The player contracts in the case at bar were never sold because the players were no longer fit to play league baseball. Rather, the sales were generally of the more valuable players, whom the majors wanted for their own teams. We are not dealing with the replacement of an obsolete factory, old rental cars, or lost or damaged rental tools. The latter would seem to be the type of activities which the capital asset provisions were intended to cover. Rather, we are dealing with sales pursuant to an agreement which the taxpayer had to sign in order to be able to attract talented ball players—in effect, the "raw materials" or "stock in trade" of the business—in the first place. Such an activity would seem to be as "integral" as one could get.

We conclude that the Tax Court correctly applied *Corn Products* in the light of *Malat*. We need not consider other grounds on which the Commissioner seeks to support the decision.

Affirmed.