BUENA VISTA FARMS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7173–74. Filed June 20, 1977.

*George H. Koster,* for the petitioner.
*Peter D. Bakutes,* for the respondent.

FAY, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the calendar year 1971 in the amount of $18,951.

Due to concessions, the sole issue remaining is whether the gain realized by petitioner on the sale of a portion of its contractual right to receive certain water was capital gain or ordinary income.

### FINDINGS OF FACT

Certain facts were stipulated and are so found.

Petitioner Buena Vista Farms, Inc., was incorporated in the State of Delaware in 1965. At the time of filing the petition herein, its principal place of business was located in San Francisco, Calif. Petitioner timely filed a Federal corporate income tax return for the calendar year 1971 with the Director, Internal Revenue Service Center, Fresno, Calif.

In 1966 petitioner merged with Buena Vista Associates, Inc., a California corporation primarily engaged in the business of farming. Petitioner is the successor corporation to Associates and as such acquired all the assets and assumed all the liabilities of Associates. During all relevant periods both corporations conducted the same businesses and were engaged in the same day-to-day activities. Consequently, the term "petitioner" will hereinafter refer to both Buena Vista Farms, Inc., and Buena Vista Associates, Inc.

The farming activities of petitioner consisted of leasing farmland to tenants for a specified rental in cash or crops. In addition, petitioner derived substantial income from the sales of water to tenants and other purchasers for irrigation purposes.

The assets of petitioner included 1,847 acres of land known as the Paloma Ranch and approximately 23,000 acres of farmland referred to herein as the lake property. These properties are located in the southwestern part of the San Joaquin Valley in Kern County, Calif. Paloma Ranch was crisscrossed by extensive pipelines installed by oil companies, and only minimal farming activities were conducted on the property.

The lake property was suitable for farming and was leased, solely for that purpose, by petitioner to the J. G. Boswell Co. (Boswell) from 1962 through 1970 under a long-term crop-sharing lease. The crops which were grown on this property consisted of cotton, different types of grain, and some specialty crops. Petitioner leased the lake property to five partnerships in 1971 for a cash rental. Petitioner's farming activities conducted in this manner were most successful, as the following chart demonstrates:

| Year | Total income | Farming income[1] | Farming income as percent of total |
|------|-------------|-------------------|-----------------------------------|
| 1961 | $739,765 | $652,031 | 88.1 |
| 1962 | 985,051 | 884,881 | 89.8 |
| 1963 | 948,306 | 829,558 | 87.5 |
| 1964 | 1,105,811 | 1,040,641 | 94.1 |
| 1966 | 1,832,203 | 1,017,684 | 55.5 |
| 1967 | 1,553,558 | 819,513 | 52.8 |
| 1968 | 1,116,947 | 789,591 | 70.7 |
| 1969 | 1,233,283 | 872,039 | 70.7 |
| 1970 | 1,294,392 | 891,336 | 68.9 |
| 1971 | 2,960,414 | 2,135,367 | 72.1 |

The southern portion of the San Joaquin Valley receives only approximately 5 inches of rainfall per year. Thus, water for agricultural purposes in the area was supplied by irrigation. As part of its farming activities, petitioner sold water to tenants for irrigation purposes. In addition, petitioner sold water for irrigation to other purchasers, though it did not maintain a sales force or solicit sales of water. Petitioner obtained this water from three principal sources: water underlying the property and brought to the surface by wells located on the property, water diverted from the Kern River pursuant to a water right equal to 4 percent of the measured flow of the river at a certain point, and water purchased from other suppliers when the first two sources were inadequate. Delivery was effectuated through an elaborate system of ditches, pipelines, drains, pumps, and wells maintained by petitioner. Petitioner derived substantial income from water which it sold to tenants (as needed, from day-to-day) pursuant

---

[1] In 1971, the only year in which petitioner actually tilled the soil, less than 20 percent of petitioner's farm acreage was actually farmed by it. There are no figures available for 1965.

to various written leases and to other purchasers as reflected by the following chart:

| | | | |
|---|---|---|---|
| 1960 | $7,498 | 1966 | 177,016 |
| 1961 | 0 | 1967 | 399,175 |
| 1962 | 22,996 | 1968 | 256,012 |
| 1963 | 41,184 | 1969 | 295,090 |
| 1964 | 17,948 | 1970 | 308,012 |
| 1965 | 0 | 1971 | 708,437 |

Petitioner consistently reported amounts received from water sales as ordinary income and claimed corresponding deductions for expenses incurred in delivering water, maintaining and repairing water delivery facilities, and purchasing water, on its Federal income tax returns. In addition, petitioner maintained a separate income account in its general ledger entitled "Water Income" for recording receipts from sales of water, and listed "inventory-water" and "water-inventory" as an asset on its balance sheets from 1963 through 1967.

In 1964 the State of California (hereinafter referred to as the State) embarked upon the construction of the California Aqueduct. The purpose of the aqueduct was to transport water from northern to central and southern California.

Due to its extremely dry condition, soil in portions of the San Joaquin Valley is subject to severe settling when water soaks the soil. This problem is generally known as shallow subsidence. To alleviate this problem, the State decided to preconsolidate or soak the soil in certain portions of the aqueduct's pathway prior to the construction of the aqueduct.

In conjunction with this project, negotiations ensued between the California Department of Water Resources and petitioner concerning the furnishing of water by petitioner to the State for a portion of its preconsolidation requirements. During the course of the negotiations, there was no threat or discussion of condemnation of petitioner's water supplies. These negotiations culminated in an agreement entitled "Preconsolidation Water Agreement" (agreement) and dated June 1, 1964, which provided inter alia:

A. As part of the facilities of the State Water Resources Development System being constructed by State pursuant to the California Water Resources Development Bond Act, State proposes to construct an aqueduct

with appurtenant pumps, structures and equipment running generally in a southeasterly direction through the southern portion of Kern County;

B. State desires to acquire during the period of construction of said aqueduct a supply of water, ranging in quantity from a minimum of 47,000 acre-feet to a maximum of 76,400 acre-feet, to be used for preconsolidation of soils in the construction of said aqueduct;

* * *

Now, THEREFORE, Associates hereby agrees to sell, exchange, deliver and transport water to State and State hereby agrees to purchase and exchange water with Associates and to compensate it in accordance with the following provisions, to each and all of which the parties hereby mutually agree:

1. *Quantity:* Associates shall deliver and State shall take hereunder not less than 23,500 acre-feet nor more than 38,200 acre-feet of water together with the transportation loss water hereinafter described.

* * *

4. *Transportation Losses:* The maximum and minimum quantities of water to be supplied to State by Associates * * * are quantities measured at Terminal Point as above identified. It is recognized that there may be channel losses between various Delivery Points and Terminal Point, and Associates agrees to supply all such losses, but shall be compensated for the same by State in manner hereinafter provided in subparagraphs 9(b) and 9(c)(3).

* * *

9. *Compensation and Price:* State shall compensate Associates for water supplied and services rendered hereunder as follows:

* * *

(b) In accordance with the provisions of paragraph 10, State shall deliver to Associates 131,600 acre-feet of water in exchange for the first 23,500 acre-feet of Associates' water delivered to and measured at the Terminal Point, and in exchange for an agreed transportation loss of 9,400 acre-feet to be incurred in transporting the first 47,000 acre-feet or any part thereof of water under both this contract and the contract of State with Kernco.

(c) State shall compensate Associates for the remaining quantities of water required to be delivered by Associates pursuant to this contract as follows:

* * *

(2) Within ninety (90) days after the end of each calendar month during which water is delivered hereunder, State shall pay Associates the sum of $8.50 per acre-foot for each acre-foot of Associates' water in excess of 23,500 acre-feet delivered to and measured at the Terminal Point.

* * *

10. *Exchange Water:*

* * *

(b) State shall, after completion of State aqueduct deliver to Associates, or its designees, at aqueduct's side, all quantities of water to which Associates is entitled pursuant to subparagraph 9(b) herein. Such water shall be delivered by State as requested by Associates, or its designee, prior to the year 1985, at such times as State determines it has capability to deliver surplus water * * * in excess of the annual entitlements of water

supply contractors * * * provided, however, that no water shall be delivered in any year in which a shortage occurs * * *. Requests for water pursuant to this paragraph shall be made in writing three months prior to the year * * * in which water deliveries are desired.[2]

With regard to payment, petitioner agreed to receive water from the aqueduct when completed (hereinafter referred to as exchange water) as payment for the initial 32,900 acre-feet of water delivered to the State due to the scarcity of the commodity in the area.[3]

In 1965 and 1966, 23,499 acre-feet of water was delivered to the State under the agreement. Payments received by petitioner in money for water sold to the State pursuant to the agreement were reported as ordinary income for the year in which such payments were received.

By March 10, 1968, all of the water to be furnished the State under the agreement had been delivered.[4]

Petitioner claimed deductions from ordinary income on its Federal income tax returns for expenses of delivering water to the State pursuant to the agreement.

In 1971 prior to requesting or receiving any portion of the 131,600 acre-feet of exchange water from the State, as provided by paragraphs 9(b) and 10(b) of the agreement, petitioner sold 10 percent of its right to such water to a certain individual for $105,279.[5]

On its 1971 Federal income tax return, petitioner reported the $105,279 received as long-term capital gain from "water rights."[6] In his notice of deficiency, respondent determined that such amount constituted ordinary income.

---

[2] The record indicates that 1 acre-foot of water is the amount of water necessary to cover 1 acre of land with 12 inches of water.

[3] The 131,600 acre-feet of water represents 32,900 acre-feet multiplied by 4. Pursuant to the 1966 merger, Buena Vista Farms, Inc., succeeded to all of Buena Vista Associates, Inc.'s rights and obligations under the Preconsolidation Water Agreement.

[4] The parties have stipulated that 54 percent of the water furnished in 1965 and 1966 by petitioner to the State pursuant to the agreement, came from petitioner's wells, and the remaining 46 percent came from water purchased by petitioner for purposes of delivery to the State. Seventy-nine percent of the water furnished in 1967 and 1968 by petitioner to the State pursuant to the agreement came from petitioner's wells, and the remaining 21 percent came from water purchased by petitioner for purpose of delivery to the State.

[5] This amount represents approximately $8 per acre-foot.

[6] Petitioner reported all $105,279 received as gain in accordance with his acknowledged basis of zero in the exchange water.

OPINION

The parties have framed the issue before us very narrowly, and we will confine our opinion to that issue. Specifically, we are to decide whether the gain realized by petitioner in 1971 from the assignment and sale of a portion of a contract interest or right, to receive certain exchange water, represents capital gain or ordinary income.

Petitioner's position is predicated on its assertion that what it sold was an interest in an executory contract with a right thereunder to acquire certain property. Petitioner argues that as such, the contract represents "property" which does not fall within the exclusionary provisions of section 1221,[7] and thus constitutes a capital asset in its hands. Petitioner therefore concludes that the gain realized from such sale represents capital gain. We find petitioner's argument unpersuasive as it fails to distinguish between the conversion of a capital investment and the sale of a right to earned income.

As the Supreme Court stated in *Commissioner v. Gillette Motor Co.*, 364 U.S. 130, 134 (1960):

> While a capital asset is defined * * * as "property held by the taxpayer," it is evident that not everything which can be property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. * * * Thus the Court has held that an unexpired lease, * * * corn futures, * * * and oil payment rights * * * are not capital assets even though they are concededly "property" interests in the ordinary sense. * * *

Thus, the mere fact that what was sold by petitioner was a "contract right" does not establish that what was sold was a capital asset. See *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260 (1958); *United States v. Woolsey*, 326 F.2d 287, 291 (5th Cir. 1963); *United States v. Eidson*, 310 F.2d 111, 113–114 (5th Cir. 1962); *Holt v. Commissioner*, 35 T.C. 588 (1961), affd. 303 F.2d 687 (9th Cir. 1962).

Rather, it must be determined from an examination of the nature of the underlying sale of water to the State which gave rise to petitioner's right under the contract, whether such "contract right" represents a capital investment or an income right for Federal income tax purposes. *Commissioner v. P. G.*

---

[7] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

*Lake, Inc., supra; Commissioner v. Ferrer,* 304 F.2d 125 (2d Cir. 1962), revg. in part 35 T.C. 617 (1961); *Norton v. United States,* 551 F.2d 821 (Ct. Cl. 1977, 39 AFTR 2d 77–1000, 77–1 USTC par. 9296); *Holt v. Commissioner, supra.*

Such a determination requires that we initially ascertain whether the water petitioner sold to the State constituted a capital asset in petitioner's hands.[8] Section 1221(1) provides that "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" is excluded from the definition of a capital asset. Thus, proceeds from the sale of such "property" represent ordinary income.

In the present case, the record clearly indicates that petitioner held its water primarily for sale to customers in the ordinary course of its business. Throughout the period from 1962 to 1971, petitioner's sales of water to lessees and other purchasers were continuous and substantial. Petitioner reported proceeds from water sales as ordinary income and claimed deductions for expenses attributable to the delivery of water, maintaining water delivery facilities, and purchasing water. In addition, an elaborate system of ditches, pipelines, drains, pumps, and wells was maintained by petitioner for the transport of water. Furthermore, water was listed as inventory in petitioner's financial statements from 1963 through 1967.

The record indicates no reason to distinguish water sales by petitioner to the State from sales to other customers. Indeed, petitioner not only purchased approximately 46 percent of the quantity of such water specifically for resale to the State, but reported cash payments from the State as ordinary income.[9]

---

[8] If water was a capital asset in petitioner's hands, a contractual right to acquire water would appear to also represent a capital asset. See *Dorman v. United States,* 296 F.2d 27 (9th Cir. 1961). If the contractual right in issue represents the gain from the sale of a capital asset, the matter becomes largely theoretical. The proceeds would represent capital gain whether viewed as derived from the sale of a capital asset (the contract right) or the assignment by petitioner of its right to receive such capital gain. See *Arrowsmith v. Commissioner,* 344 U.S. 6 (1952).

[9] We find petitioner's emphasis on its lack of a sales force and solicitations to refute the strong inference suggested by the foregoing pattern of conduct to be unpersuasive. While we are mindful of the significance sometimes attached to this factor, in view of the fact that petitioner's water resources were well known, the arid nature of the climate, and petitioner's lease provisions requiring tenants to purchase water from petitioner, we believe such sales efforts on the part of petitioner were unnecessary in this instance.

In view of the foregoing, the conclusion is inescapable that had petitioner received cash as payment for the entire amount of water it furnished the State under the contract, such amount would have been taxable as ordinary income. *Westchester Development Co. v. Commissioner,* 63 T.C. 198 (1974); cf. *Arrowsmith v. Commissioner,* 344 U.S. 6 (1952). Furthermore, it is evident that petitioner's contractual right to receive exchange water from the State represents, in substance, a right to receive income from the sale of a noncapital asset. *Commissioner v. P. G. Lake, Inc.,* 356 U.S. 260 (1958); *Hort v. Commissioner,* 313 U.S. 28 (1941); cf. *Kingsbury v. Commissioner,* 65 T.C. 1068 (1976).

While no issue is presented in this case regarding the taxable year in which the exchange water was properly reportable by petitioner as ordinary income, it is clear that payment in kind does not serve to transmute ordinary income into capital gain. See sec. 1.61-1(a), Income Tax Regs.

Accordingly, we hold that upon the sale of 10 percent of its contractual right, petitioner merely received a substitute for what would otherwise constitute ordinary income, and is taxable as such.

Having so concluded, we need not consider whether the *Corn Products* doctrine exception to section 1221 is applicable in this case. See *Corn Products Co. v. Commissioner,* 350 U.S. 46 (1955); *Hollywood Baseball Association v. Commissioner,* 423 F.2d 494 (9th Cir. 1970), affg. 49 T.C. 338 (1968); *Norton v. United States, supra.*

*Decision will be entered for the respondent.*