GORDON RANDOLPH FORRER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Forrer v. Commissioner
Docket No. 8718-78.
United States Tax Court
T.C. Memo 1981-418; 1981 Tax Ct. Memo LEXIS 321; 42 T.C.M. (CCH) 613; T.C.M. (RIA) 81418; August 11, 1981. Gordon Randolph Forrer, pro se. William F. Garrow, for the respondent. DAWSON
MEMORANDUM FINDINGS *325 OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the calendar years 1973 and 1974 in the respective amounts of $ 20,200.60 and $ 18,242.70. The sole issue for decision is whether section 170(e)(1)(A)[1] precludes a charitable contribution deduction and carryover claimed by petitioner for the donation of a royalty agreement to a qualified donee. FINDINGS OF FACT Virtually all of the fact have been stipulated and are found accordingly. Petitioner resided in Northville, Michigan, at the time that he filed his petition in this case. He timely filed Federal income tax returns for the calendar years 1973 and 1974 with the office of the Internal Revenue Service at Detroit, Michigan. On Schedule A of his 1973 return he claimed a noncash deduction for the "transfer as donation to Johns Hopkins University [of] total interest in publishing contract valued at $ 77,350.00." Because of the percentage limitation of section 170(b)(1)(A), petitioner only deducted $ 40,349.80 *326 of that amount on his 1973 return. Pursuant to section 170(d)(1)(A), he carried over the balance, or $ 37,000.20, to his 1974 return. Respondent disallowed the deduction and carryover under section 170(e)(1)(A). Petitioner disputed that disallowance and petitioned to this Court for a redetermination. Petitioner is a physician and has been engaged in the practice of psychiatry for a number of years. In December 1968 he entered into a written agreement with Libra Publishers, Inc. of Long Island, New York ("Libra"). The agreement granted Libra the exclusive right to print, publish, and sell petitioner's book entitled Weaning and Human Development in exchange for the right to receive certain royalties. [2] The parties agree that this contract conveyed all of petitioner's literary property rights in his book. On November 20, 1973, Libra, by written "endorsement," consented to petitioner's assignment of his rights in their agreement to "any institution of learning." A *327 few days thereafter, on November 23, 1973, petitioner wrote the following letter to the Johns Hopkins University: I wish to offer the University a gift of all of the publication rights of a book of which I am the author. The value of the contract between myself and the publisher of "Weaning and Human Development" (Libra, 1969) has been appraised at $ 77,350.00. The anticipated income from royalties will be realized over the life of the original copyright and its renewal. If you are interested in accepting this donation will you write me a letter stating this; identifying the gift as a donation of all rights without reservation or remuneration to the donor, Gordon R. Forrer, M.D., in a contract between himself and Libra Publishers for the publication of "Weaning and Human Development" having an appraised value of $ 77,350.00 including royalties payable January 1, 1974. Upon receipt of the contract properly transferred to the University I shall require a written receipt defining the donation in the same terms provided in your letter of acceptance. I should appreciate prompt consideration of this offer and your reply since I wish to conclude transfer of this property within *328 the next few weeks. By letter dated November 27, 1973, Johns Hopkins accepted the offer. Three days later petitioner executed an assignment of "his each and every right in a publishing contract * * * regarding his book." On the same date Libra "endorsed" the assignment and agreed to henceforth remit all royalties payable under the agreement to Johns Hopkins. Presumably the assignment and "endorsement" were then delivered to the University, which acknowledged the donation on December 28, 1973. As stated above, petitioner claimed a noncash, charitable contribution deduction on Schedule A of his 1973 income tax return. In accordance with section 1.170A-1(a)(2)(ii), Income Tax Regs., he attached he his return a statement in support of the deduction claimed. [3] The statement described the donation as a contract for the "publication, sale and payment of royalties" in respect of his book and indicated that "no cost basis [was] applicable." *329 OPINION Under section 170(e)(1)[4] the amount of certain contributions of appreciated property, otherwise deductible, must be reduced [5] by all or part of the gain which would have been recognized had the property been sold by the donor at its fair market value at the time of its donation to the charity. Thus, under section 170(e)(1)(A) a contribution of "ordinary income property" must be reduced by the amount of gain which would not have been long-term capital gain, i.e., which would have been ordinary income or short-term capital gain. On the other hand, a contribution of a capital asset which if sold would yield long-term capital gain is generally deductible in full at its fair market value. Section 1.170A-1(c)(1), Income Tax Regs. However, under section 170(e)(1)(B) a contribution of such property must be reduced in three specific instances, [6] none of which is here applicable, by a specified percentage of what would have been long-term capital gain. [7]
*330 In view of the foregoing, the framework for decision in this case is as follows: if petitioner contributed a capital asset which if sold on the date of donation would have yielded long-term capital gain, he is entitled to deduct its fair market value on the date of donation without any reduction whatsoever. In other words, he would be entitled to the deduction and carryover as claimed. On the other hand, if petitioner contributed "ordinary income property," his deduction would be limited to his basis in the property. As a practical matter this would mean that he is not entitled to any deduction (or carryover) because he failed to introduce any evidence of his basis in the donation, Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure, and because the available evidence suggests that he had no basis therein. Section 1.170A-4(b)(1), Income Tax Regs., defines "ordinary income property" as "property any portion of the gain on which would not have been long term capital gain if the property had been *331 sold by the donor at its fair market value at the time of its contribution to the charitable organization." By way of example that section specifically includes a manuscript prepared by the donor. This is consonant with section 1221(3)(A) which specifically excludes from the definition of "capital asset" copyrights, literary, musical, and artistic compositions, letters and memoranda, and similar property, held by the taxpayer whose personal efforts created such property. It is also consonant with section 1231(b)(1)(C) which specifically excludes from the definition of "property used in the trade or business" property described in section 1221(3). [8]
There is thus no question that petitioner's book, in his hands, was ordinary income property, and we do not understand him to contend otherwise. In fact, he acknowledges that if he had donated his book to Johns Hopkins, he would not have been entitled *332 to any deduction. He contends, however, that what he donated was not his book but rather his interest in the contract with Libra. He further contends that if he had sold his contract rights on the date of donation, his gain would have qualified as long-term capital gain because those rights do not fall within subsection (3)(A) or any of the other exclusionary provisions of section 1221. We disagree. Not every contract right is a capital asset. Thus, in Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 134-135 (1960), the Supreme Court stated: While a capital asset is defined * * * as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. * * * Thus the Court has held that an unexpired lease, * * * corn futures, * * * and oil payment rights * * * are not capital assets even though they are concededly "property" interests in the ordinary sense. * * * See also Hort v. Commissioner, 313 U.S. 28, 31 (1941); *333 Cline v. Commissioner, 617 F.2d 192, 194-195 (6th Cir. 1980). Whether or not a contract right is a capital asset depends on whether it represents a capital investment or an income right, which in turn depends on the nature of the underlying transaction which gave rise to the contract right. Buena Vista Farms, Inc. v. Commissioner, 68 T.C. 405, 411 (1977); see Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 265-266 (1958); Cline v. Commissioner, supra at 195. We have already pointed out that petitioner's book was not a capital asset in his hands because of the provisions of section 1221(3)(A). On would expect, therefore, that the proceeds from the sale of such an asset would yield ordinary income. Buena Vista Farms, Inc. v. Commissioner, supra at 412. The legislative history of the predecessor of section 1221(3)(A), section 117(a)(1), I.R.C. 1939, as amended by section 210(a), Revenue Act of 1950, ch. 994, 64 Stat. 906, 932-933, expressly states that Congress intended that income from the sale of books by "amateur," as well as professional, authors de taxed as ordinary income and *334 not as capital gain. S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483, 515, 543-544; H. Rept. No. 2319, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 380, 420-421, 445-447. See Cranford v. United States, 338 F.2d 379, 382 (Ct. Cl. 1964); Stern v. United States, 164 F. Supp. 847, 851 (E.D. La. 1958), affd. per curiam 262 F.2d 957 (5th Cir. 1959), cert. denied 359 U.S. 969 (1959). Thus, petitioner's royalties constituted ordinary income. [9] In our opinion the contractual right to receive royalties is indistinguishable from the royalties themselves. After all, it was the right to receive royalties that petitioner received in exchange for his book, and that contractual right must perforce be ordinary income property in his hands. [10] Had petitioner sold that right, and thus in effect accelerated the receipt of royalties, he would have received "essentially a substitute for what would otherwise be received at a future time as ordinary income." Commissioner v. P.G. Lake, Inc., 356 U.S. at 265. *335 See also Hort v. Commissioner, 313 U.S. at 32; Buena Vista Farms, Inc. v. Commissioner, 68 T.C. at 413; Denison v. Commissioner, T.C. Memo. 1977-430, slip opinion p. 11 ("* * * an amount received as a substitute for ordinary income is taxable as ordinary income even though a property right has technically been transferred"). Under those circumstances his profit would have been ordinary income and not capital gain. Any other result would effectively serve to allow a taxpayer to convert ordinary income into capital gain by the simple expedient of discounting future income. This, the Supreme Court has held, cannot be done. Commissioner v. P.G. Lake, Inc., supra at 266-267. See also Cline v. Commissioner, 617 F.2d at 195. *336 Petitioner argues that a different result should obtain in this case because the amount of future income was uncertain. Again we disagree. The mere fact that the exact amount of future income is not known does not serve to change its character asincome. See Hale v. Commissioner, T.C. Memo. 1965-274. In any event, we note that petitioner's appraiser valued his interest in the contract based on anticipated future royalties. The fact that future income can be reasonably estimated means that its present value can be determined by an appropriate discount. Under these circumstances there is just as much a conversion of future income into present income as if the exact amount of the future income were known. Petitioner also relied on two cases, United States v. Dresser Industries, Inc., 324 F.2d 56 (5th Cir. 1963), and Ayrton Metal Co. v. Commissioner, 299 F.2d 741 (2d Cir. 1962), affg. in part and revg. in part 34 T.C. 464 (1960), in support of his position. In United States v. Dresser Industries, Inc., supra, the taxpayer and another corporation entered into a contract whereunder *337 the taxpayer acquired an exclusive license to commercially exploit a patent in exchange for a percentage of the fees to be earned thereby. Some years later the taxpayer transferred the exclusive feature of the license back to the other corporation for $ 500,000. The court found that the taxpayer did not regularly deal in the sale of patents, and held that the $ 500,000 represented gain from the sale of a capital asset and not ordinary income. Dresser is clearly inapposite. There the court specifically found that the exclusive feature of the license was a capital asset. Not surprisingly, therefore, the profit derived from its sale was held to be capital gain. Cf. section 1235; S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483, 515. Had petitioner sold his contract rights in the present case, however, he would have been paid "for the right to receive future income, not for an increase in the value of * * * income-producing property." Commissioner v. P.G. Lake, Inc., 356 U.S. at 266. In Ayrton Metal Co. v. Commissioner, supra, the taxpayer and another corporation, both of whom were in the business of operating *338 mines as well as buying and selling metals, engaged in a joint venture. The venture involved the operation of an antimony mine in Bolivia for a third party as well as the right to purchase its ore and even the mine itself. After a relatively short period of time a dispute arose between them. The dispute was resolved when the taxpayer agreed to withdraw from the joint venture in exchange for certain sums of money. Two such sums were paid. The court determined that the first sum represented payment of the taxpayer's share of the profits of the joint venture and the second sum payment for its interest in the joint venture. The court then determined that the taxpayer's interest in the joint venture was a capital asset; thus, the amount received therefor was capital gain. The court concluded that the first sum was ordinary income under the facts and circumstances of the case; however, in dicta it noted (299 F.2d at 749) that "a right to future, uncertain profits may be considered to be a capital asset." [Emphasis added; citations omitted.] We think that Ayrton is also inapposite. If a contract right represents a capital investment, it can constitute a capital *339 asset. See Buena Vista Farms, Inc. v. Commissioner, 68 T.C. at 411. However, as we have already discussed, petitioner's contract rights represented nothing more than the right to receive ordinary income in the form of royalties. Although uncertain in exact amount, his future royalties were susceptible to reasonable estimation and valuation. Moreover, they were completely due to his personal efforts in writing the book. Under similar circumstances we have previously held that a sale of such rights would not constitute a conversion of a capital investment. Rather, the proceeds from such a sale would represent the present value of income which the recipient would otherwise receive in the future as ordinary income. Hale v. Commissioner, T.C. Memo. 1965-274. See Commissionerv. P.G. Lake, Inc., 356 U.S. 260 (1958). In his petition the petitioner alleged that he was advised by one of respondent's agents in 1973 that "the proposed donation of [his] total contractual interest to a charitable organization qualified as a charitable contribution." Respondent denied this allegation in his answer. The issue was not further pursued *340 in the stipulation of facts, at trial, or on brief, although petitioner did raise it in his trial memorandum. While respondent treats the issue as if petitioner had abandoned it, we will address it briefly. Petitioner's allegation suggests equitable estoppel. The advice allegedly rendered, however, is not erroneous on its face. Even if it were, respondent is not bound by erroneous statements made by his agents. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384 (1947); Hinman v. Commissioner, T.C. Memo. 1978-133; see Green v. Commissioner, 59 T.C. 456, 458 (1972); cf. Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324 (1974); Boulez v. Commissioner, 76 T.C. 209 (1981). Finally, in his petition the petitioner prays for an award of "legal fees expended in this matter." At all stages of his case before this Court, however, he appeared pro se. In any event, this Court has held that it does not have jurisdiction to award either attorney's fees, Key Buick Co. v. Commissioner, 68 T.C. 178 (1977), *341 affd. 613 F.2d 1306 (5th Cir. 1980), or costs, Sharon v. Commissioner, 66 T.C. 515, 533-534 (1976), affd. 591 F.2d 1273 (9th Cir. 1978), cert. denied 442 U.S. 941 (1979), to a petitioner. To reflect our conclusions herein, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
2. The agreement contained a number of other provisions, most of which are irrelevant to this case. One provision, however, barred petitioner from assigning his interest without Libra's written consent.↩
3. Petitioner also attached an appraisal. This appraisal, dated November 16, 1973, was prepared by Libra's president and relied on by petitioner to establish the amount of his donation. Respondent, however, did not question the appraisal nor did he raise any valuation issue. Accordingly, the donation's value is presumed to be $ 77,350 for purposes of this case.↩
4. (e) Certain Contributions of Ordinary Income and Capital Gain Property.-- (1) General rule.--The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of-- (A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), and (B) in the case of a charitable contribution-- (i) of tangible personal property, if the use by the donee is unrelated to the purpose or function constituting the basis for its exemption under section 501 (or, in the case of a governmental unit, to any purpose or function described in subsection (c)), or (ii) to or for the use of a private foundation (as defined in section 509(a)), other than a private foundation described in subsection (b)(1)(E), 50 percent (62 1/2 percent, in the case of a corporation) of the amount of gain which would have been long-term capital gain if the property contributed and been sold by the taxpayer at its fair market value (determined at the time of such contribution). For purposes of applying this paragraph (other than in the case of gain to which section 617(d)(1), 1245(a), 1251(c), or 1252(a) applies), property which is property used in the trade or business (as defined in section 1231(b)↩) shall be treated as a capital asset. 5. The reductions mandated by section 170(e)(1) should be contrasted with the percentage limitations of section 170(b)↩. 6. Two of the three instances are set forth in section 170(e)(1)(B). The third instance is set forth in section 170(b)(1)(D)(iii) and involves the situation where a taxpayer elects to disregard the special 30 percent limitation of section 170(b)(1)(D)(i). (Note that section 170(b)(1)(D) was redesignated as section 170(b)(1)(C)↩ by section 1901(a)(28), P.L. 94-455, 90 Stat. 1520, 1768, effective for taxable years beginning after December 31, 1976.) 7. Section 1.170A-4(b)(2) defines that type of property as "section 170(e)↩ capital gain property." Note that such property is only a subset of all capital assets which if sold would yield long-term capital gain.
8. Other than in the case of gain to which certain recapture sections apply, section 170(e)(1)↩ provides that "property used in the trade or business" shall be treated as capital assets.
9. Petitioner agrees. In fact on Schedule E of his 1973 return he reported predonation royalties in the amount of $ 35.11 as ordinary income. On brief he states that "[s]o long as [he] retained his interest in the contract, the profits in the form of royalties or as his share from the proceeds of the sale of certain non-literary rights, would have been ordinary income." ↩
10. Petitioner's agreement with Libra did accord him rights other than the right to receive royalties. Those other rights, however, only served to protect his income interest. For example, if under certain circumstances Libra failed to keep the book in print and for sale, all literary rights would revert to petitioner and he would have the option to purchase the printing plates. We have, therefore, equated his right to receive royalties with the totality of his contract rights. It should also be noted that petitioner's appraiser valued his interest in the contract exclusively on the basis of anticipated future royalties.↩